IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 6, 2009 Session

**STATE OF TENNESSEE v. CHARLES WILLIAMS**

**Appeal from the Criminal Court for Shelby County**

**No. 07-04461    David G. Hayes, Special Judge**

---

**No. W2008-02211-CCA-R3-CD  -  Filed May 13, 2010**

---

The Defendant, Charles Williams, was convicted by a Shelby County Criminal Court jury of first degree felony murder and especially aggravated robbery, a Class A felony. Following a sentencing hearing, the trial court sentenced the Defendant as a Range I standard offender to consecutive sentences of life and fifteen years for the felony murder and especially aggravated robbery convictions, respectively. In this appeal as of right, the Defendant contends that (1) the trial court erred in denying his motion to suppress evidence; (2) the trial court erred in denying his motion for judgment of acquittal based on the constructive amendment of the indictment in his case; and (3) the evidence was insufficient to support his convictions. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Wilson Jones, District Public Defender; Harry E. Sayle, III (on appeal), Jennifer Case, and Mary Kathryn Kent (at trial), Assistant Public Defenders, attorneys for appellant, Charles Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; and Damon Griffin and Theresa McCusker, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

**OPINION**

At trial, Percell Duckett testified that he was walking his dog sometime before 7:00 a.m. on Sunday, March 11, 2007, when he noticed a car parked on the north side of the walking trail by the Woodland Hills neighborhood. Upon further investigation, he discovered that the car was empty and that the driver's side door was open. As he continued walking along his normal path he saw a man, later identified as Christopher Smith, lying on his back off the trail near a pond. Mr. Duckett assumed that Mr. Smith, the victim, was asleep. As he walked closer, he observed a gun on the ground "just to the right of [the victim]" and within the victim's reach. Afraid that his dog might bark and startle the victim, Mr. Duckett "starting walking very, very fast" until he reached his home, where he called 9-1-1.

Deputy William Franks of the Shelby County Sheriff's Office testified that he was on duty as a patrolman when he received a call regarding an armed man in the Woodland Hills area on March 11, 2007. He arrived at Mr. Duckett's house at the same time Officer John Thomas of the Shelby County Sheriff's Office arrived. Deputy Franks and Officer Thomas talked with Mr. Duckett before they began walking along the trail to find the victim. As they were walking, Deputy Franks noticed a "little gray vehicle parked" near the area. They continued along the path until they saw the victim near the pond with a weapon in close proximity to his body. The officers attempted to speak to him, but he did not respond. As they approached the victim, Officer Franks moved the weapon away from the victim's reach. As they got closer to him, they realized that he was not sleeping because "[t]here was no rising or falling of the chest . . . [and his] lips were kind of ashy [in] color."

Sergeant Butterick of the Shelby County Sheriff's Office testified that he arrived at the crime scene at 9:30 a.m. on March 11, 2007. Once at the crime scene, Sergeant Butterick took pictures and collected evidence. He collected a black compact disc case with a set of digital scales[1] inside the case, a Ruger 9 millimeter, a magazine from the 9 millimeter, and three fired .380 shell casings. Sergeant Butterick stated that there were nine rounds in the magazine, that the safety on the 9 millimeter was on, and that the chamber was empty. Using a projection rod, Sergeant Butterick located two bullets in the ground near the victim. He also noticed a gray Oldsmobile Alero at the crime scene. After leaving the crime scene, he tested the 9 millimeter for prints but was unable to find any prints.

Kevin Helms, who, at the time of the investigation, was employed with the Shelby County Sheriff's Office as Sergeant of the Street Crimes Unit, was also assigned to investigate the case. Mr. Helms was initially sent to the crime scene, where he was later directed to interview the victim's family. After talking with Jonathan Smith, the victim's brother, Mr. Helms learned that a person named Terrance Rose may have called Mr. Smith asking to speak with the victim on the night of March 10, 2007. At trial, Mr. Smith stated

---

[1]Sergeant Butterick said that there may have been residue on the scales but that it was never tested.

that he received a call from someone who identified himself as "Markese" and asked to speak with the victim. According to Mr. Smith, "Markese" sounded like Mr. Rose. Mr. Smith also stated that this same person who sounded like Mr. Rose called again after midnight and said "tell [the victim] to meet us on the trail."

After talking with Mr. Smith, Mr. Helms proceeded to Mr. Rose's residence where he learned that four people had just left the house in a blue Dodge Charger to go to a barbeque in North Memphis. Mr. Helms returned to Mr. Smith's house and learned that Shuronda Burks normally drove the Charger and that she lived with Mr. Rose, her two brothers, Anthony and Brandon Johnson,[2] and her parents. Mr. Helms and his unit then drove to North Memphis to find them. Upon arriving in North Memphis, they identified the four individuals as Ms. Burks, Mr. A. Johnson, Mr. B. Johnson, and Mr. Rose. After a pat-down search of Mr. Rose revealed several bags of marijuana, Mr. Helms arrested Mr. Rose. All four individuals were then transported to police headquarters where they gave a series of statements.

After receiving information from Mr. Rose, officers searched Mr. Rose's attic in the bedroom that he shared with Mr. B. Johnson and found a Jennings .380 automatic revolver. Upon receiving information from Mr. Rose that the Defendant was also involved, Mr. Helms and his unit began searching for the Defendant on March 12, 2007. Mr. Helms eventually located the Defendant, and as Mr. Helms was arresting the Defendant, a pat-down search for weapons revealed several small bags of marijuana. Mr. Helms stated that he already had enough information to arrest the Defendant and that the discovery of the marijuana did not impact his decision to arrest the Defendant.

At trial, Dr. Miguel Laboy of the Forensic Medical Center testified that although he did not perform the autopsy, he was able to determine from the autopsy report that the victim died from a "gunshot wound of the torso" and that the bullet entered the right buttock and tore through the "muscle of the anterior abdominal wall." There were no exit wounds as the bullet remained in the body until the autopsy and was recovered from the upper abdominal wall. Dr. Laboy stated that the bullet traveled in an upward position from the right to the left and from the back to the front. The victim's boxer shorts contained a bullet hole and blood stains; however, there was no mention of a bullet hole or blood stains in regards to the jeans the victim was wearing. The crime scene photographs show that the victim's jeans were buckled but they were down around his knees.

Cervinia Braswell of the Tennessee Bureau of Investigation (TBI) testified regarding the firearms involved in this case. Ms. Braswell tested the Ruger 9 millimeter found at the

_____

[2]We will refer to Anthony Johnson as Mr. A. Johnson and Brandon Johnson as Mr. B. Johnson in order to avoid confusion.

crime scene and the Jennings .380 automatic revolver found at Mr. Rose's residence. Ms. Braswell was able to determine that the safety on the Ruger 9 millimeter was working properly and that the discharged bullets at the scene were fired from the Jennings .380 and not the Ruger 9 millimeter. Ms. Braswell stated that the cartridge cases found at the scene would have been ejected out of the right side of the weapon and would have only traveled, if not moved by a person, from 7 to 10 feet away from the weapon. Ms. Braswell was also able to determine that the bullet recovered from the victim's body was fired from the Jennings .380 and not from the Ruger 9 millimeter.

Sergeant Chris Harris of the Shelby County Sheriff's Office testified that he was assigned as the case officer and that he arrived at the crime scene at approximately 8:00 in the morning. Eventually, he left the crime scene and interviewed Mr. Smith. Mr. Smith told Sergeant Harris that he received some calls from "Markese" regarding the victim and that the last time that he spoke with the victim was after midnight. At this time, the victim was on his way to meet "Markese." Sergeant Harris then discussed the Defendant's statements while they were played for the jury.

Sergeant Harris took the Defendant's first statement on March 12, 2007. The Defendant said that Mr. A. Johnson introduced him to Mr. Rose and that he has known Mr. Rose for several months. On March 10, 2007, at approximately midnight, the Defendant went to Mr. A. Johnson's house, where he saw Mr. Rose, the Johnson brothers, and a man named Marquavius.[3] Upon arriving, Mr. Rose asked the Defendant if he wanted to go with him to buy some marijuana from the victim. As they were walking to meet the victim, Mr. Rose gave the Defendant a gun and said, "hold this." The pair went to a walking trail that was located behind the neighborhood and waited for the victim. When the victim arrived in a silver car, they negotiated a price for some marijuana. When Mr. Rose said that he only wanted to buy some of the marijuana, the victim became angry and turned his back. When the victim turned back around, he showed them his gun and asked them to empty their pockets. The Defendant then pulled Mr. Rose's gun out of his pocket. When the victim saw the gun, he fired. The Defendant returned fire as he was running away. When asked whether it was possible if the Defendant just thought that the victim fired, the Defendant admitted that it was possible and said, "I guess so, I don't know, I was just scared."

Sergeant Harris took a second statement from the Defendant on March 13, 2007 at 2:30 in the afternoon. This time, the Defendant said that he arrived at Mr. A. Johnson's house around 8:00 or 9:00 p.m. and that they were smoking and drinking when Mr. Rose said he knew where he could get them some more marijuana. According to the Defendant, Mr. Rose showed him a gun and said we can do this, "it will be easy." The plan was to take the

---

[3]Spelled phonetically.

marijuana by force because they did not have enough money to buy the two ounces of marijuana that Mr. Rose ordered from the victim. The Defendant said that two ounces of marijuana was worth approximately one hundred and fifty dollars. According to the Defendant, when the victim gave them the marijuana, Mr. Rose said that they were just going to take it without paying. The victim said, "hell no" and showed them his gun. At this point, the Defendant began shooting as he was running away. The Defendant admitted that the victim may have been running away. When they got back to the house, the Defendant gave the gun to Mr. Rose and left with approximately an ounce of the marijuana after telling Mr. A. Johnson what happened on the trail. The Defendant said that he parked his car behind an abandoned house the next day because he knew that the police were looking for him.

Mr. B. Johnson, Ms. Burks, and Mr. A. Johnson testified at trial that they did not see the Defendant on March 10, 2007. On that day, they went to their grandmother's house with their family and Mr. Rose. Mr. B. Johnson testified that they left the house around 8:30 or 9:00 in the evening, and when they returned home, he went to the room that he shared with Mr. Rose. As Mr. B. Johnson was going to sleep around midnight, he noticed Mr. Rose getting ready for bed. When he woke up on March 11, 2007, he observed marijuana on the dresser and saw that Mr. Rose was in the bedroom holding a "pistol." Mr. Rose told him that "he had to deal with a [n - - - a a - s] last night."

Mr. B. Johnson and Mr. A. Johnson testified that they spoke with Mr. Smith in front of their house on the morning of March 11, 2007. According to the Johnsons, during this conversation, Mr. Smith told Mr. Rose that the victim received a call from someone who sounded like Mr. Rose before the victim was found dead. After Mr. Rose denied calling the victim, Mr. Rose went in the house. When Mr. B. Johnson went inside to his bedroom, he saw Mr. Rose coming out of the attic that is located in their bedroom.

Ms. Burks testified at trial that they returned from their grandmother's house around 10:30 or 10:45 in the evening and that she went to her room, talked on the phone, and fell asleep. When she woke up on March 11, 2007, her cell phone[4] was missing. Later that morning, Mr. Rose returned her cell phone. Ms. Burks went with her family and Mr. Rose to her grandmother's house on March 11, 2007. On the way, Mr. Rose said that "something happened on the back of the lake . . . some three shots was fired." According to Ms. Burks, before the police arrived that afternoon, Mr. Rose asked her to tell the police that she loaned her phone to "Marquette" at the Berryhill Market Store.

Mr. A. Johnson testified at trial that they returned home around 10:00 p.m. and that he went to his room and slept until he woke up the next morning. On March 11, 2007, he

---

[4]Mr. B. Johnson told the jury his sister's cell phone number.

noticed that there was approximately two ounces of "weed" in the house. He testified that Mr. Rose told him after Mr. Smith left that the victim "pulled his gun out" during a drug deal. He said that Mr. Rose told him that he "shot and ran" and that he threw the gun into the lake.

Mr. Damian Todd, Mr. Carl Jowers, and Mr. Jeffrey Flaherty all testified that they lived somewhat near the crime scene and that they were home on the night of March 10, 2007. Mr. Todd stated that he heard some "popping sounds" at around 11:30 that night. Mr. Jowers stated that he heard around four gunshots at approximately 11:30 that night and that he heard a motorcycle[5] leaving the area at a high rate of speed approximately 30 seconds after he heard the gunshots. Mr. Flaherty stated that he heard approximately four gunshots between 11:15 and 11:30 that night.

Special Agent Laura Hodge of the TBI testified for the defense that she received three gunshot residue kits from Sergeant Harris. Each kit contained clothing from either the Defendant, Mr. Rose, or the victim. Special Agent Hodge stated that gunshot residue "can be deposited from either handling, firing or being near a gun when it fired." The residue may be removed from clothing and skin by soap and water or may simply be wiped away after a period of time. In regard to the gunshot residue kit from the Defendant, she stated that "[e]lements indicative of gunshot residue were absent" meaning that the "results cannot eliminate the possibility that the individual could have fired, handled or was near a gun when it fired." In regard to the gunshot residue kits from Mr. Rose and the victim, she stated that "[e]lements indicative of gunshot residue were inconclusive" meaning that the she found "some levels" of the elements present in gunshot residue; however, the levels were not high enough for her to state that gunshot residue was present.

Detective Sergeant Raymond W. Sides of the Shelby County Sheriff's office testified that he processed two vehicles in this case. On March 11, 2007, Detective Sides processed an Alero found at the crime scene. Inside the car, he found an Uncle Mike's black holster, two cell phones, and two magazines - "[o]ne was loaded with two live rounds of Winchester Ruger 9 millimeter and the other one was empty." On March 12, 2007, Detective Sides processed a Ford Taurus that was in a backyard "behind an abandoned house in an area in Memphis and still running, door open." Inside the Taurus, he found "headphones, [compact discs], jackets, ball cap, clothing, skull caps and other ball caps." He did not find fingerprints in either of the two vehicles.

Lieutenant John Mills of the Shelby County Sheriff's office testified that he interviewed Ms. Annie Hess, the victim's mother, on March 11, 2007. Ms. Hess told him that someone called her from a telephone number matching Ms. Burks's telephone number

_____

[5]Mr. Smith testified that the victim knew a man named "J-Mon" who drove a motorcycle.

in the late morning of March 10, 2007.[6] Lieutenant Mills also searched the victim's bedroom and found "an empty gun box [for] a stainless steel Ruger," a traffic ticket, and other "minor items."

Special Agent James Russell Davis of the TBI testified that he received clothing from Sergeant Harris in regards to this case. He received a white shirt, denim pants, and a black belt that belonged to the Defendant. He also received a striped shirt that belonged to Mr. Rose. Special Agent Davis analyzed the items for gunshot residue. The clothing obtained from the Defendant "did not reveal the presence of particles of gunshot primer residue." Conversely, the clothing obtained from Mr. Rose "revealed the presence of particles unique to gunshot primer residue." Special Agent Davis also noted that gunshot residue may be removed by washing the clothing and that gunshot residue may be present on someone's clothing if they were merely near the weapon when it was fired and not the one actually firing the weapon.

The State recalled Detective Sides as a rebuttal witness. Detective Sides stated that he was present for all three interrogations of Mr. Rose taken by Sergeant Harris. The State then played the entirety of all three taped statements from Mr. Rose.

The first statement was taken on March 11, 2007 at 8:30 in the evening. Mr. Rose called the victim with Ms. Burks's cell phone and arranged a meeting with the victim to buy a "quarter pounder" of marijuana, which is worth approximately three hundred and twenty-five dollars, but the victim said he had about a "quarter" of marijuana, which is only worth fifteen dollars. Mr. Rose asked the Defendant to go with him for protection. The Defendant drove the two of them in a red Ford Taurus, and on their way, the Defendant showed him a gun and said, "[W]ell if he tries to do something, you good." When the victim arrived, they noticed that the victim had a gun in his left pocket and the weed in his right pocket. After the victim showed Mr. Rose the marijuana, the victim retrieved the gun from his left pocket and fired the gun at Mr. Rose's feet as the victim was backing away. The Defendant then shot at the victim three times. The two ran to the car and returned to the house, where they went inside for ten minutes. Mr. Rose did not know what happened to the gun or the marijuana. The marijuana he had when he was arrested came from a "dude off Springdale."

The second statement was taken later in the day on March 11, 2007. Mr. Rose admitted that he bought the gun from an "older head" for sixty dollars. When he asked the Defendant to go with him "for protection," he gave the Defendant the gun. During the drug deal, the victim let him smell the marijuana. As Mr. Rose was smelling the marijuana, the victim reached for a weapon and fired one shot while backing away. The Defendant fired

---

[6]Her testimony at trial was consistent with this statement.

Mr. Rose's gun three times in response. The Defendant drove him back to the house, where he hid the gun in the attic at the top of the door under the insulation. He did not know that the victim was dead because he did not see him fall down.

The third statement was taken on March 13, 2007 at 12:00 in the afternoon. Mr. Rose said that he called the victim earlier in the day to set up the drug deal. He told the victim that his name was "Marquette." At approximately 11:00 on the night of March 10, 2007, Mr. Rose talked to the victim the final time and agreed to meet to buy two ounces of marijuana, which is worth approximately one hundred and twenty dollars. Mr. Rose only had fifteen dollars. According to Mr. Rose, when the Defendant volunteered to go, he grabbed Mr. Rose's gun from the dresser in the house. The Defendant also said that if the victim had more than fifteen dollars worth of marijuana, then they should just take it from the victim. When Mr. Rose was holding the marijuana, the Defendant shot the victim. The victim pulled out his gun and was running away when the Defendant shot at the victim two more times. Mr. Rose said that he thought the Defendant shot the victim in the leg. They did not chase the victim, but they did see the victim fall down in the grass. When they arrived back at the Johnson residence, they split up the marijuana, and Mr. Rose hid the gun in the attic.

## ANALYSIS

### I. Motion to Suppress

The proof at the suppression hearing consisted solely of the testimony of Sergeant Helms and Sergeant Harris. Sergeant Helms testified that he spoke with Mr. Smith who told him that he thought Mr. Rose called asking for the victim and that Mr. Rose was pretending to be someone named "Markese." Sergeant Helms stated that after driving to North Memphis to find Mr. Rose, he rode back to the station with Ms. Burks. In the car, Ms. Burks told him that she let a man named "Markese" use her cell phone. Upon further questioning, Ms. Burks finally admitted that Mr. Rose was the one who took her cell phone, that he told her to tell the police that "Markese" used her cell phone, and that Mr. Rose also told her that he shot the victim.

After Mr. Rose was interrogated, Sergeant Helms was sent to recover the Jennings .380 automatic revolver from Mr. Rose's attic. After recovering the gun, he prepared a report on the Defendant, and the next morning, he was sent to find and arrest the Defendant. He did not remember if he told the Defendant that he was charged with a crime or that he was arrested. Sergeant Helms stated that he was sent there to arrest the Defendant and that if the Defendant did not cooperate, he would have forcibly restrained him and put him in handcuffs. After arresting the Defendant, Sergeant Helms brought him to a holding cell at approximately 4:45 in the afternoon. Later in the afternoon, at approximately 5:30 p.m., the Defendant was brought to an interview room, where he signed a <u>Miranda</u> rights waiver form

in front of Sergeant Helms and Sergeant Harris. Before he signed the waiver form, the Defendant was not told that he was free to leave because he was not free to leave. Sergeant Helms stated that the Defendant was under arrest even though he may not have specifically told the Defendant that he was under arrest.

In regard to the Defendant's involvement, Sergeant Helms said that Mr. Rose implicated the Defendant, but he could not remember who first implicated the Defendant. Sergeant Helms admitted that he was not present for the entirety of any interrogation. He stated that he believed Mr. B. Johnson said that the Defendant was with Mr. Rose when the shooting happened and that Mr. B. Johnson was the person who first identified the Defendant by photograph. He also stated that Ms. Burks told them that the Defendant was at their house the night of March 10, 2007 for a party.

Sergeant Harris stated that he was assigned as the case officer to investigate the victim's murder. In the course of his investigation, he interviewed Ms. Burks, the Johnson brothers, Mr. Rose, and the Defendant. He stated that Ms. Burks and the Johnson brothers told him that Mr. Rose admitted to shooting the victim. The three did not mention the Defendant in their statements. Mr. A. Johnson told Sergeant Harris that Mr. Rose had two ounces of marijuana on March 11, 2007 and that this was the marijuana that Mr. Rose "bought" from the victim.

When he interrogated Mr. Rose, Mr. Rose implicated the Defendant. According to Sergeant Harris, Mr. Rose was the only person who mentioned the Defendant. Sergeant Harris stated that they took three statements from Mr. Rose because he did not believe that he was getting the full story. Mr. Rose told them that he threw the gun into the lake, but he later recanted this part of his statement and told them, in his second statement, that the gun was in the attic. In response to Mr. Rose's admission of the true location of the gun, Sergeant Harris sent a team to the Johnson house to recover the gun, which was found in the attic. Mr. Rose also told Sergeant Harris that the Defendant came to his house and that they went to meet the victim "with the intent to rob [the victim] of the marijuana." After interrogating Mr. Rose, who was being held for the charge of murder, he "developed [the Defendant] as the second suspect" and directed his unit to find the Defendant.

Sergeant Harris stated that, at this point in the investigation, he had enough information to charge the Defendant with "murder two." He did not have a warrant for the Defendant's arrest because he "was going to give [the street crimes unit] some time to locate [the Defendant] and if they hadn't located him then I would have [obtained an arrest] warrant." Once the Defendant was brought to Sergeant Harris for questioning sometime between 5:00 and 6:00 p.m. on March 12, 2007, Sergeant Harris read him his Miranda rights and made sure that he understood his rights before he signed the rights waiver form. Sergeant Helms was present for "the beginning of the interview phase." Sergeant Harris

stated that the Defendant was awake and alert throughout the interrogation and that he voluntarily gave his statement. The Defendant did tell him that he was drinking the night of the murder, but according to Sergeant Harris, the Defendant did not appear intoxicated when he was interrogated. In his first statement, the Defendant admitted being present for the robbery and shooting the weapon, but he was partially blaming Mr. Rose for the murder. After taking the Defendant's first statement, Sergeant Harris filled out an affidavit of complaint for second degree murder that was approved by the magistrate. Sergeant Harris then interrogated Mr. Rose again and confronted him with the discrepancies between the Defendant's and Mr. Rose's statements.

After interrogating Mr. Rose for the third time, Sergeant Harris retrieved the Defendant and told him that there were some inconsistencies between their statements. He read the Defendant his Miranda rights for a second time, and the Defendant signed and dated the rights waiver form. The Defendant's second statement was taken on March 13, 2007 at 1:57 in the afternoon. The Defendant admitted that they went to meet the victim with the intention of robbing him and that he shot the victim. After the Defendant gave his second statement, he was charged with first degree murder in perpetration of a robbery. Sergeant Harris characterized the discrepancies between Mr. Rose's third statement and the Defendant's second statement as "minor" and "unimportant."

Based upon this evidence and briefs submitted by the State and the Defendant, the trial court denied the Defendant's motion to suppress in a written order, which stated in pertinent part:

> This [c]ourt is not persuaded that [Mr. Rose] is a criminal informant as contemplated by law . . . even if [Mr.] Rose were considered a criminal informant for purposes of this case the argument would still fail. [Mr.] Rose obviously has personal knowledge about the facts of the case because he admitted he was present and committed the crime. Second, for purposes of determining probable cause, his information is reliable because it is a statement against [Mr. Rose's] penal interest. He implicates himself in a murder and a reasonable person would not be likely to expose himself to such criminal liability if the statement were not true. Therefore it has the indicia of truthfulness and as a result is reliable and credible. Again, although the Court is not finding that [Mr.] Rose should be considered a criminal informant, for purposes of this argument if he were this allegation would have no merit. A review of the testimony of the officers indicates that they had probable cause to believe the [D]efendant was involved in the murder of the

-10-

victim based in large part on the statement of [Mr. Rose]. Other witnesses put the [D]efendant in the company of [Mr.] Rose and [Mr.] Rose implicates himself and the [D]efendant in a murder in perpetration of a robbery. Therefore, under either theory this Court finds that the officers had probable cause to arrest the [D]efendant for murder.

. . .

Next, the [D]efendant alleges that the statements given by him were involuntary and should be suppressed. The [D]efendant did not testify that his statements were involuntarily given. The State introduced evidence that the [D]efendant was advised of his [Miranda] Rights and that he waived those rights and gave his statements freely and voluntarily with full knowledge of the implication of giving said statements. Officers testified that the [D]efendant never asked for an attorney and that he cooperated with them and freely and voluntarily gave his statements . . . The Court finds that this allegation has no merit and should be denied.

"[A] trial court's findings of fact in a suppression hearing [are conclusive on appeal] unless the evidence preponderates otherwise." State v. Binette, 33 S.W.3d 215, 217 (Tenn. 2000) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. Both proof presented at the suppression hearing and proof presented at trial may be considered by an appellate court "in deciding the propriety of the trial court's ruling on a motion to suppress." State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App. 1999); State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). However, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Furthermore, an appellate court's "review of a trial court's application of law to the facts . . . is conducted under a de novo standard of review." State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citations omitted).

*Probable Cause to Arrest*

In support of his argument that the trial court erred in denying his motion to suppress, the Defendant first claims that his warrantless arrest was illegal because officers did not have probable cause to arrest him. He contends that his arrest was based on information obtained

from Mr. Rose, who should have been characterized as a criminal informant. As a criminal informant, the Defendant argues that the State must prove Mr. Rose's "basis for knowledge" and the "reliability" or "veracity" of his knowledge pursuant to Spinelli v. United States, 393 U.S. 410, 416 (1969) and Aguilar v. Texas, 378 U.S. 108, 114 (1964). The Defendant also contends that because his arrest was illegal, the trial court erred in failing to suppress his statements, as well as the marijuana taken by the officer at the time of his arrest. The State responds that Mr. Rose was properly characterized as a citizen informant, and in the alternative, even if Mr. Rose was a criminal informant, Mr. Rose satisfies the Aguilar-Spinelli test.

In this case, the Defendant was arrested without a warrant. A warrantless arrest, like a warrantless seizure, "is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the [arrest] was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997) (citations omitted). In Tennessee, a warrantless arrest may be made in certain instances, including "[f]or a public offense committed . . . in the officer's presence" or "[w]hen a felony has in fact been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." Tenn. Code Ann. § 40-7-103(a)(1), (3). While the statute does not define "reasonable cause," our courts have held that a warrantless arrest must be based on "probable cause [that] must be more than mere suspicion." State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982).

For probable cause to exist, the facts and circumstances as they are known to the officer at the time of the arrest must be "'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" Bridges, 963 S.W.2d at 491 (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). "[B]efore a finding of probable cause may be based upon an informant's tip, the basis of the informant's knowledge and the informant's credibility must also be established." Id. (citing State v. Jacumin, 778 S.W.2d 430, 432-36 (Tenn. 1989)).

We must first note that we reject the trial court's conclusion that Mr. Rose was not a "criminal informant as contemplated by law." Tennessee law recognizes a distinction between those who are "citizen informants, or bystander witnesses, and criminal informants, or those from the criminal milieu." State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993) (internal citations and quotations omitted). A person from the criminal milieu is one who is "intimately involved with the persons informed upon and with the illegal conduct at hand." State v. Melson, 638 S.W.2d 342, 354 (Tenn. 1982) (internal citations and quotations omitted). Information provided by criminal informants "is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject." State v. Stevens, 989 S.W.2d 290, 294 (Tenn. 1999) (internal citations and quotations omitted). In contrast, citizen informants are either the

"victims of the crime or have otherwise seen some portion of it." Melson, 638 S.W.2d at 354 (internal citations and quotations omitted). Information provided by known citizen informants is "presumed to be reliable," while information provided by criminal informants does not carry any presumptions of reliability and must be tested. Stevens, 989 S.W.2d at 293.

As a co-defendant[7] and the first person implicated in the murder, Mr. Rose was not "an ordinary citizen who report[ed] a crime which [was] committed in his presence," and he certainly did not act with the "intent to aid the police in law enforcement because of his concern for society or for his own [physical] safety." State v. Stevens, 989 S.W.2d 290, 294 (Tenn. 1999) (citing State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993)). Thus, "it is proper to demand that some evidence of [his] reliability and credibility be shown" in accordance with the Aguilar-Spinelli test. Id.

We do acknowledge that the basis of Mr. Rose's knowledge was overwhelmingly established because he admitted his involvement in the crime. The second prong of the test, his credibility or reliability, is less apparent. While there is no indication that Mr. Rose has previously given reliable information to the police, Mr. Rose never denied his involvement in the murder. Additionally, all of his statements were against his penal interest. In his second statement, taken before the Defendant was arrested, Mr. Rose told Sergeant Harris where the murder weapon was located. Officers retrieved the weapon from exactly where Mr. Rose said it would be, in the attic under the insulation. Following our review, we conclude that Sergeant Helms had probable cause to arrest the Defendant and that the trial court did not err in denying the motion to suppress the statements on this ground. Accordingly, we also uphold the denial of the motion to suppress the marijuana obtained as a result of the search incident to the Defendant's lawful arrest. Chimel v. California, 395 U.S. 752, 762-63 (1969).

*Statement*

The Defendant also contends that the trial court erred in denying his motion to suppress his statements because the Defendant did not "give either of his statements voluntarily." The State does not respond to this argument.

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution protect a person against compelled self-incrimination. The Supreme Court has held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."

---

[7]Mr. Rose was also indicted and tried for his involvement in the victim's murder.

Miranda v. Arizona, 384 U.S. 436, 444 (1966). Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. A defendant may waive those rights, but such waiver must be made "voluntarily, knowingly, and intelligently." Id. The State has the burden of proving the waiver by a preponderance of the evidence. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

The Defendant did not testify or submit any evidence in the suppression hearing that would suggest that he was coerced into giving a statement or that his statement was involuntary. In contrast, the State provided ample evidence that the Defendant signed Miranda waivers and agreed to talk with Sergeant Harris. Following our review, we conclude that the evidence does not preponderate against the trial court's finding that the Defendant's statements were given freely and voluntarily.

## II. Indictment

The Defendant contends that the trial court erred in denying his motion for judgment of acquittal because the indictment did not describe a crime under Tennessee law. Moreover, the proof submitted at trial "did not support a conviction of the crime purportedly alleged in the indictment," and the trial court constructively amended the indictment by charging the jury on felony murder. The State responds that "the indictment tracks the language of the first degree murder statute, names the [D]efendant, states the underlying felony, provides the date of the offense, and identifies the name of the victim."

The indictment in this case alleges that the Defendant "did unlawfully and with the intent to commit First Degree Murder kill CHRISTOPHER SMITH during the perpetration of Especially Aggravated Robbery, in violation of T.C.A. 39-13-202, against the peace and dignity of the State of Tennessee." At the time of the offense, first degree felony murder was defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy" with the intent to commit the enumerated offense. Tenn. Code Ann. § 39-13-202(2), (b) (2006). Consequently, in the Defendant's case, the State had to prove that the Defendant intended to commit a robbery. Id. Thus, robbery should have been listed in the indictment where first degree murder appears. The Defendant did not bring this error to the trial court's attention until after the close of the State's proof when the Defendant, citing this error, moved for a judgment of acquittal.[8]

---

[8]At some point after the trial court denied the Defendant's motion for judgment of acquittal, the
(continued...)

Although motions alleging defects in the indictment "must be raised before trial" or the claim is subject to waiver, a party may raise a claim that the indictment "fails to charge an offense" at any time. Tenn. R. Crim. P. 12(b)(2)(B). The overriding principle governing indictments is that the accused is constitutionally guaranteed the right to be informed of the nature and cause of the accusation. U.S. Const. amend. 6, 14; Tenn. Const. art. I, § 9; see Wyatt v. State, 24 S.W.3d 319, 324 (Tenn. 2000). Our courts have interpreted this constitutional mandate to require an indictment to "1) provide notice to the accused of the offense charged; 2) provide the court with an adequate ground upon which a proper judgment may be entered; and 3) provide the defendant with protection against double jeopardy." Wyatt, 24 S.W.3d at 324 (citations omitted). Further, an indictment is statutorily required to "state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner so as to enable a person of common understanding to know what is intended and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment." Tenn. Code Ann. § 40-13-202. The question of the validity of an indictment is one of law and, as such, our review is de novo. State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997).

"A variance between an indictment or a subsequent bill of particulars and the evidence presented at trial is not fatal unless it is both material and prejudicial." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000) (citing State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984)). "A variance between an indictment and the proof in a criminal case is not material where the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of the right to be protected against another prosecution for the same offense." Moss, 662 S.W.2d at 592. It is not reversible error when a defendant is sufficiently aware of the charge and is able to adequately prepare for trial. Id. Contrary to the Defendant's assertion, we conclude that the indictment described a crime under Tennessee law in that it referenced the appropriate statute for first degree felony murder and provided the Defendant with sufficient notice to prepare for trial.

The Defendant cites State v. Goodson in support of his second contention that his conviction should be reversed because the proof at trial did not correspond to the indictment on which the Defendant was convicted. 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001). While we acknowledge the correctness of the Goodson decision, the facts do not apply to this Defendant's case. In Goodson, the defendant was indicted for driving on a revoked license;

---

[8](...continued)
words "First Degree Felony Murder" were marked out and the word "Robbery" was inserted in the margin with what appears to be a pen. It is unclear who drew a line through first degree murder and wrote in robbery or when this change occurred. The Defendant does not assert this as an issue on appeal.

however, the evidence at trial "established the separate offense of driving on a suspended license." Id. at 241-42. This court held that "[t]he proof introduced at trial regarding the [defendant's] suspended driving status constituted a constructive amendment of the indictment by broadening the grounds for conviction." Id. at 245. In contrast, we believe that the proof at this Defendant's trial overwhelmingly corresponded to the indicted offense of felony murder in the perpetration of a robbery.

We also reject the Defendant's contention that the trial court constructively amended the indictment by instructing the jury on felony murder. Again, the indictment was sufficient to notify the Defendant that he was charged with felony murder in the perpetration of a robbery, and the trial court's jury charge corresponded to the crime charged in the indictment. State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000) (holding that an indictment that provides "notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements"). Accordingly, we conclude that the trial court did not err in denying the Defendant's motion for judgment of acquittal.

## III. Sufficiency

The Defendant contends that the evidence is insufficient to support his convictions because the Defendant's statements, which were obtained following an illegal arrest, were "the only evidence presented at trial upon which the jury could convict." The State responds that the "evidence supports the jury's conclusion that the [D]efendant is guilty of first degree murder and especially aggravated robbery."

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The Defendant's conviction for first degree murder required proof that the Defendant killed the victim "in the perpetration of or attempt to perpetrate any . . . robbery" and that he intended to commit the robbery. Tenn. Code Ann. § 39-13-202(a)(2), (b) (2006). The Defendant's conviction for especially aggravated robbery required proof that the Defendant committed a "robbery as defined in § 39-13-401 . . . [and that the robbery was a]ccomplished with a deadly weapon; and . . . the victim suffer[ed] serious bodily injury." Tenn. Code Ann. § 39-13-403 (2007).

The Defendant is correct in contending that his "conviction cannot be founded solely upon [his] confession." State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000) (citing Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911)). However, the convictions in this case were not based solely upon the his confession. The record reflects that the victim died from a gunshot wound to the buttocks and that Mr. Rose's gun was the murder weapon. Mr. Rose and the Defendant admitted that they set up a meeting with the victim in order to rob him of his marijuana. Mr. Rose stated that the Defendant brought Mr. Rose's gun to the meeting and that the Defendant opened fire when Mr. Rose was holding the marijuana. The Defendant admitted that he used Mr. Rose's gun to shoot at the victim. When the Defendant and Mr. Rose were arrested, they both had some marijuana, which in the aggregate corresponded to the approximate amount that was stolen from the victim. While we do note that a majority of the damaging evidence was submitted through the statements of Mr. Rose, the Defendant's accomplice, Mr. Rose's statements were corroborated by the other testimony and evidence presented at trial. Accordingly, we conclude that the conviction was not based solely upon the Defendant's confession and that the evidence was sufficient to support his convictions.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-17-